1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsarroyo.com
   CRAIG W. SMITH (164886)
3  csmith@robbinsarroyo.com
   JENNY L. DIXON (192638)
4  jdixon@robbinsarroyo.com
   GINA STASSI (261263)
5  gstassi@robbinsarroyo.com
   600 B Street, Suite 1900
6  San Diego, CA 92101
   Telephone: (619) 525-3990
7  Facsimile: (619) 525-3991

8  Attorneys for Plaintiff

9  [Additional Counsel on Signature Page]

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13  WARREN DRABEK, Derivatively on Behalf    )  Case No.  CV 13 3705
14  of DYNAVAX TECHNOLOGIES                   )
    CORPORATION,                              )
15                                            )  VERIFIED SHAREHOLDER DERIVATIVE
                            Plaintiff,        )  COMPLAINT FOR BREACH OF
16                                            )  FIDUCIARY DUTY, WASTE OF
        v.                                    )  CORPORATE ASSETS, AND UNJUST
17                                            )  ENRICHMENT
                                              )
18  DINO DINA, J. TYLER MARTIN, DENISE        )
    M. GILBERT, ARNOLD L. ORONSKY,            )
19  PEGGY V. PHILLIPS, DENNIS A. CARSON,      )
    STANLEY A. PLOTKIN, FRANCIS R.            )
20  CANO, and DANIEL L. KISNER,               )
                                              )
21                          Defendants,       )
                                              )
22       - and -                              )
                                              )
23                                            )
    DYNAVAX TECHNOLOGIES                      )
24  CORPORATION, a Delaware corporation,      )
                                              )
25                   Nominal Defendant.       )
26  _____ )  DEMAND FOR JURY TRIAL

27

28

_____
                VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Plaintiff, by his attorneys, submits this verified shareholder derivative complaint against the
2  defendants named herein.

3  **NATURE OF THE ACTION**

4  1.  This is a verified shareholder derivative action brought by plaintiff on behalf of
5  nominal defendant Dynavax Technologies Corporation ("Dynavax" or the "Company") against
6  certain of the Company's officers and directors seeking to remedy their breaches of fiduciary duties,
7  waste of corporate assets, and unjust enrichment. These breaches of law have caused and will
8  continue to cause substantial monetary losses to Dynavax and other damages, such as to the
9  Company's reputation and goodwill.

10  2.  Dynavax is a biopharmaceutical company engaged in the clinical development of new
11  drugs for treatment of infectious and inflammatory diseases. Dynavax's main focus is on seeking
12  approval from the U.S. Food and Drug Administration ("FDA") for HEPLISAV™, a Phase III
13  investigational adult hepatitis B vaccine designed to provide higher and earlier protection with fewer
14  doses than other currently licensed vaccines.

15  3.  Despite being the Company's sole Phase III drug candidate, the defendants reviewed
16  and approved the inadequately designed clinical trial for HEPLISAV. In addition, these same
17  defendants caused or allowed the Company to make improper statements concerning the status of
18  HEPLISAV's FDA approval process. As explained in greater detail below, the Individual
19  Defendants (as defined herein) disregarded numerous red flags alerting them of the deficiencies in
20  the Phase III clinical trial for HEPLISAV, and the results gathered as a result thereof. These red
21  flags included the fact that: (i) the safety database for the Phase III clinical trial for HEPLISAV was
22  less than *half* the size of the median safety database size for the twelve most recent FDA vaccine
23  approvals, and thus inadequate to rule out rare adverse autoimmune events; (ii) the trial
24  demographics for the Phase III clinical trial were not representative of the population in the United
25  States and lacked sufficient representation of Asian-Americans, African-Americans, and Latin-
26  Americans; (iii) the Phase III clinical trial lacked a one-year safety follow-up typically required for
27  vaccines; (iv) the Phase III clinical trial lacked information concerning concurrent use with other
28  vaccines; and (v) Dynavax failed to provide the FDA with sufficient data concerning its

- 1 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   manufacturing processes and controls for HEPLISAV. Despite these deficiencies, the Individual

2   Defendants caused the Company to waste its dwindling corporate assets by continuing to undergo

3   the poorly designed clinical trial.

4         4.     In addition, the Individual Defendants were responsible for a series of improper

5   statements regarding the testing process for HEPLISAV and its prospects of gaining FDA approval.

6   In particular, defendants concealed the problems in the design of HEPLISAV's Phase III clinical trial

7   and the insufficient data gathered therein. Moreover, defendants maintained a confident and

8   optimistic outlook concerning the Company's business prospects and even touted plans to transition

9   from a clinical-stage biopharmaceutical company, with no marketable products, to a commercial

10   operation after the FDA approved Dynavax's Biologic License Application ("BLA") for HEPLISAV.

11        5.     The truth about the Company's business prospects slowly began to emerge on

12   November 15, 2012. On that day, Dynavax issued a press release announcing that the FDA's

13   Vaccines and Related Biological Products Advisory Committee ("VRBPAC") voted eight to five

14   with one abstention that there was insufficient data to adequately support the safety of HEPLISAV.

15   VRBPAC was particularly concerned about the robustness of the safety data in order to rule out

16   potential rare events, given that HEPLISAV contains a novel adjuvant[1] that has not been broadly

17   studied before.

18        6.     Four months later, Dynavax announced that it received a Complete Response Letter

19   ("CRL") from the FDA regarding its BLA for HEPLISAV. The CRL stated that: (i) HEPLISAV

20   cannot be approved without supplementary safety data; (ii) the FDA indicated a willingness to

21   consider approving HEPLISAV under a restricted-use label; and (iii) the FDA requested additional

22   information regarding the Company's process validation program and its manufacturing controls and

23   facilities.

24        7.     Subsequently, on June 10, 2013, Dynavax disclosed that it had recently conducted a

25   follow-up meeting with the FDA regarding its BLA for HEPLISAV. According to the Company,

26

27   ———————————

[1] An adjuvant is a pharmacological agent added to a drug to increase or aid its effect.

28

1   the FDA would require Dynavax to conduct additional safety trials before the FDA would even
2   consider approving HEPLISAV. The FDA further declined to approve HEPLISAV with a
3   restricted-use label. Finally, the Company acknowledged that it still needed to resolve its
4   outstanding manufacturing issues with the FDA and revise its existing BLA accordingly.

5          8.      The revelations concerning HEPLISAV's true prospects caused the Company's
6   market capitalization to plunge nearly 69%, erasing more than $568 million in market capitalization.
7   As a direct result of the Individual Defendants' wrongdoing, the Company is now the subject of
8   multiple securities class actions (the "Securities Class Actions") filed in the U.S. District Court for
9   the Northern District of California on behalf of investors who purchased Dynavax's shares. These
10  Securities Class Actions pose the risk of hundreds of millions of dollars in damages to the Company.

11                          **JURISDICTION AND VENUE**

12         9.      This Court has jurisdiction in this case over all causes of action asserted herein
13  pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states
14  and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a
15  collusive action designed to confer jurisdiction on a court of the United States that it would not
16  otherwise have.

17         10.     This Court has jurisdiction over each defendant named herein because each defendant
18  is either a corporation that conducts business in and maintains operations in this District, or is an
19  individual who has sufficient minimum contacts with this District to render the exercise of
20  jurisdiction by the District courts permissible under traditional notions of fair play and substantial
21  justice.

22         11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i)
23  Dynavax maintains its principal place of business in this District; (ii) one or more of the defendants
24  either resides in or maintains executive offices in this District; (iii) a substantial portion of the
25  transactions and wrongs complained of herein, including the defendants' primary participation in the
26  wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties
27  owed to Dynavax, occurred in this District; and (iv) defendants have received substantial

28

1  compensation in this District by doing business here and engaging in numerous activities that had an

2  effect in this District.

3                        **INTRADISTRICT ASSIGNMENT**

4          12.    This action is properly assigned to the San Francisco division of this Court.

5                              **THE PARTIES**

6  **Plaintiff**

7          13.    Plaintiff Warren Drabek has continuously been a shareholder of Dynavax since

8  December 22, 2011. Plaintiff is a citizen of New York.

9  **Nominal Defendant**

10         14.    Nominal defendant Dynavax is a clinical-stage biopharmaceutical company

11  incorporated in Delaware with principal executive offices located at 2929 Seventh Street, Suite 100,

12  Berkeley, California. Accordingly, Dynavax is a citizen of both Delaware and California. Dynavax

13  aims to discover and develop novel products to prevent and treat infectious and inflammatory

14  diseases. Dynavax's lead product candidate is HEPLISAV, a Phase III investigational adult hepatitis

15  B vaccine.

16  **Defendants**

17         15.    Defendant Dino Dina ("Dina") is a Dynavax director and has been since May 1997.

18  Defendant Dina was also Dynavax's Chief Executive Officer ("CEO") from May 1998 to April 2013.

19  Upon his departure as an officer of the Company, defendant Dina was retained by Dynavax as a

20  consultant and is entitled to substantial payouts under his employment agreement. In addition to

21  receiving approximately $1.1 million in severance payments, defendant Dina will receive a monthly

22  retainer of $50,000 for a term of four months and an option to purchase 100,000 shares of Dynavax

23  common stock for his consulting services. Defendant Dina is named as a defendant in the Securities

24  Class Actions that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934

25  ("Exchange Act"). Defendant Dina knowingly, recklessly, or with gross negligence: (i) made, and

26  caused or allowed the Company to make, improper statements concerning HEPLISAV's prospects of

27  gaining FDA approval; and (ii) ignored red flags alerting him of the deficiencies in HEPLISAV's

28

                                         - 4 -

1 Phase III clinical trial and the results gathered therein. Dynavax paid defendant Dina the following

2 compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|-----------------------------------------|------------------------|-------|
| 2012 | $460,000 | $633,000 | $1,652,750 | $138,000 | $9,934 | $2,893,684 |

6 Defendant Dina is a citizen of California.

7       16.    Defendant J. Tyler Martin ("Martin") is a Dynavax director and has been since July

8 2010. Defendant Martin was also Dynavax's President from July 2010 to May 2013 and Chief

9 Medical Officer from February 2009 to May 2013.  Upon his departure as an officer of the

10 Company, defendant Martin was retained by Dynavax as a consultant and received approximately

11 $1.8 million in severance payments.  Defendant Martin is named as a defendant in the Securities

12 Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant

13 Martin knowingly, recklessly, or with gross negligence: (i) caused or allowed the Company to make

15 improper statements concerning HEPLISAV's prospects of gaining FDA approval; and (ii) ignored

16 red flags alerting him of the deficiencies in HEPLISAV's Phase III clinical trial and the results

17 gathered therein. Dynavax paid defendant Martin the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|-----------------------------------------|------------------------|-------|
| 2012 | $412,000 | $633,000 | $1,322,200 | $113,300 | $26,132 | $2,506,632 |

21 Defendant Martin is a citizen of Nebraska.

22       17.    Defendant Denise M. Gilbert ("Gilbert") is a Dynavax director and has been since

23 March 2004. Defendant Gilbert is also Chairman and a member of Dynavax's Audit Committee and

24 has been since at least April 2012. Defendant Gilbert knowingly or recklessly: (i) reviewed and

25 approved improper statements concerning HEPLISAV's prospects of gaining FDA approval; and (ii)

26 ignored red flags alerting her of the deficiencies in HEPLISAV's Phase III clinical trial and the

27 results gathered therein. Dynavax paid defendant Gilbert the following compensation as a director:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2012 | $69,500 | $183,419 | $252,919 |

3  Defendant Gilbert is a citizen of California.

4      18.    Defendant Arnold L. Oronsky ("Oronsky") is Dynavax's Chairman and has been since

5  February 2006, and a director and has been since November 1996. Defendant Oronsky is also a

6  member of Dynavax's Audit Committee and has been since at least April 2012. Defendant Oronsky

7  knowingly or recklessly: (i) reviewed and approved improper statements concerning HEPLISAV's

8  prospects of gaining FDA approval; and (ii) ignored red flags alerting him of the deficiencies in

9  HEPLISAV's Phase III clinical trial and the results gathered therein. Dynavax paid defendant

10  Oronsky the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2012 | $72,500 | $183,419 | $255,919 |

14  Defendant Oronsky is a citizen of California.

15      19.    Defendant Peggy V. Phillips ("Phillips") is a Dynavax director and has been since

16  August 2006. Defendant Phillips is also a member of Dynavax's Audit Committee and has been

17  since at least April 2012. Defendant Phillips knowingly or recklessly: (i) reviewed and approved

18  improper statements concerning HEPLISAV's prospects of gaining FDA approval; and (ii) ignored

19  red flags alerting her of the deficiencies in HEPLISAV's Phase III clinical trial and the results

20  gathered therein. Dynavax paid defendant Phillips the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2012 | $72,000 | $183,419 | $255,419 |

24  Defendant Phillips is a citizen of Washington.

25      20.    Defendant Dennis A. Carson ("Carson") is a Dynavax director and has been since

26  December 1997. Defendant Carson knowingly or recklessly: (i) caused or allowed the Company to

27  make improper statements concerning HEPLISAV's prospects of gaining FDA approval; and (ii)

- 6 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

ignored red flags alerting him of the deficiencies in HEPLISAV's Phase III clinical trial and the results gathered therein. Dynavax paid defendant Carson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2012 | $44,500 | $183,419 | $227,919 |

Defendant Carson is a citizen of California.

21.   Defendant Stanley A. Plotkin ("Plotkin") is a Dynavax director and has been since August 2005. Defendant Plotkin knowingly or recklessly: (i) caused or allowed the Company to make improper statements concerning HEPLISAV's prospects of gaining FDA approval; and (ii) ignored red flags alerting him of the deficiencies in HEPLISAV's Phase III clinical trial and the results gathered therein. Dynavax paid defendant Plotkin the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Option Awards | Total |
|---|---|---|---|
| 2012 | $44,000 | $183,419 | $227,419 |

Defendant Plotkin is a citizen of Pennsylvania.

22.   Defendant Francis R. Cano ("Cano") is a Dynavax director and has been since November 2009. Defendant Cano knowingly or recklessly: (i) caused or allowed the Company to make improper statements concerning HEPLISAV's prospects of gaining FDA approval; and (ii) ignored red flags alerting him of the deficiencies in HEPLISAV's Phase III clinical trial and the results gathered therein. Dynavax paid defendant Cano the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2012 | $164,500 | $183,419 | $347,919 |

Defendant Cano is a citizen of California.

23.   Defendant Daniel L. Kisner ("Kisner") is a Dynavax director and has been since July 2010. Defendant Kisner knowingly or recklessly: (i) caused or allowed the Company to make improper statements concerning HEPLISAV's prospects of gaining FDA approval; and (ii) ignored red flags alerting him of the deficiencies in HEPLISAV's Phase III clinical trial and the results gathered therein. Dynavax paid defendant Kisner the following compensation as a director:

- 7 -

| Fiscal Year 2012 | Fees Paid in Cash $68,500 | Option Awards $183,419 | Total $251,919 |
|---|---|---|---|

3  Defendant Kisner is a citizen of California.

4      24.    The defendants identified in ¶¶15-16 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶15-23 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17-19 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶15-23 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

    25.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Dynavax and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dynavax in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dynavax and not in furtherance of their personal interest or benefit.

    26.    To discharge their duties, the officers and directors of Dynavax were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Dynavax were required to, among other things:

    (a)    properly and accurately guide investors and analysts as to the true business prospects of the Company at any given time, including, but not limited to, making accurate statements about HEPLISAV's FDA approval process;

    (b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

- 8 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1         (c)     remain informed as to how Dynavax conducted its operations, and, upon

2 receipt of notice or information of imprudent or unsound conditions or practices, make reasonable

3 inquiry in connection therewith, and take steps to correct such conditions or practices and make such

4 disclosures as necessary to comply with applicable laws.

5         27.     The Individual Defendants knew of the risks the Company faced concerning the

6 FDA's approval of HEPLISAV. In the Company's Annual Report on Form 10-K for the period

7 ending December 31, 2012, filed with the U.S. Securities and Exchange Commission ("SEC") on

8 March 12, 2012, signed by the Individual Defendants, Dynavax identified that one of the key risks to

9 it was that the FDA would not approve HEPLISAV because data from the Phase III trial may not be

10 satisfactory, including the FDA could take issue with "the number, design, size, conduct or

11 implementation of our clinical trial or a conclusion that the data fails to meet statistical or clinical

12 significance." As the Individual Defendants admit in the Company's Proxy Statement filed with the

13 SEC on April 29, 2013, throughout 2012, senior management reviewed these risks with the

14 Individual Defendants.

15 **Breaches of Duties**

16         28.     The conduct of the Individual Defendants complained of herein involves a knowing

17 and culpable violation of their obligations as officers and directors of Dynavax, the absence of good

18 faith on their part, and a reckless disregard for their duties to the Company that the Individual

19 Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

20         29.     The Individual Defendants breached their duty of loyalty and good faith by allowing

21 defendants to cause, or by themselves causing, the Company to issue a series of improper statements

22 regarding HEPLISAV's FDA approval process, improper practices that wasted the Company's assets,

23 and caused Dynavax to incur substantial damage.

24         30.     The Individual Defendants, because of their positions of control and authority as

25 officers and/or directors of Dynavax, were able to and did, directly or indirectly, exercise control

26 over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the

27 other Individual Defendants from taking such illegal actions. As a result, and in addition to the

28 damage the Company has already incurred, Dynavax has expended, and will continue to expend,

1  significant sums of money.

2  **Additional Duties of the Audit Committee Defendants**

3       31.    In addition to these duties, under the Audit Committee Charter in effect since at least

4  April 2004, the Audit Committee Defendants, defendants Gilbert, Oronsky, and Phillips, owed

5  specific duties to Dynavax to assist the Board in overseeing the Company's financial reporting

6  process. Moreover, the Audit Committee's Charter provides that defendants Gilbert, Oronsky, and

7  Phillips owed duties to Dynavax to ensure that the Company's reporting practices are in accordance

8  with all legal and regulatory requirements. Despite these additional duties, defendants Gilbert,

9  Oronsky, and Phillips wholly abdicated their responsibilities to the Company and its shareholders by

10  allowing the Company to issue improper statements. As the Individual Defendants admit in the

11  Company's Proxy Statement filed with the SEC on April 29, 2013, throughout 2012, the Audit

12  Committee met with management and discussed "significant financial reporting matters." Further

13  the Audit Committee reviewed and discussed with management the Company's quarterly financial

14  results before their issuance. These meetings specifically included the Company's liquidity and

15  capital requirements. As such, the Audit Committee would review and approve the Company's

16  public offering of 17.5 million shares of stock and the improper announcement accompanying this

17  offering published on May 9, 2012. In addition, on information and belief, during Audit Committee

18  meetings, as required by the Audit Committee Charter, defendants Gilbert, Oronsky, and Phillips

19  discussed Dynavax's core operations, including HEPLISAV's FDA approval process. As a result of

20  these meetings and their duties as members of the Audit Committee, defendants Gilbert, Oronsky,

21  and Phillips were aware that the Company's representations regarding HEPLISAV's prospects of

22  gaining FDA approval were improper.

23            **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

24       32.    In committing the wrongful acts alleged herein, the Individual Defendants have

25  pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

26  conspired with one another in furtherance of their common plan or design. In addition to the

27  wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further

28  aided and abetted and/or assisted each other in breaching their respective duties.

33.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Dynavax, regarding the Individual Defendants' management of the Company's operations and HEPLISAV's FDA approval process; and (ii) enhance the Individual Defendants' executive and directorial positions at Dynavax and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

34.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper statements.

35.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

36.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

37.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

38.     Dynavax is a biopharmaceutical company engaged in the manufacture and clinical

1  development of new drugs for the treatment of viral and immune-based disorders. The Company's

2  pipeline of product candidates includes an autoimmune program partnered with GlaxoSmithKline; a

3  therapy for asthma partnered with AstraZeneca AB; clinical-stage programs for its Universal Flu

4  vaccine and hepatitis B therapy; and its main product candidate, HEPLISAV.

5      39.    HEPLISAV, which has been in development since 2000, is an experimental hepatitis

6  B vaccine purportedly designed to provide higher and earlier protection with fewer doses than other

7  licensed vaccines. HEPLISAV is the Company's only product that has proceeded to a Phase III

8  clinical trial. Dynavax's other experimental products are still undergoing their Phase I clinical trials.

9              **THE COMPANY INITIATES A BLATANTLY FLAWED PHASE III TRIAL**

10     40.    Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§301-97, passed by

11  Congress in 1938, new pharmaceutical products cannot be marketed or sold in the United States

12  unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and

13  effective for each of its intended uses. The Company admits in its Annual Reports, signed by the

14  Individual Defendants, that to secure FDA approval it must submit "extensive non-clinical and

15  clinical data" that a drug is "safe and effective for its intended use." The steps required before a drug

16  may be marketed in the United States include: (i) preclinical laboratory and animal tests; (ii)

17  submission to the FDA of an application for an Investigational New Drug ("IND") exemption, which

18  must become effective before human clinical trials commence; (iii) human clinical trials to establish

19  the safety and efficacy of the drug, typically proceeding in three phases; (iv) submission of a detailed

20  New Drug Application ("NDA") or BLA to the FDA; and (v) FDA approval of the NDA or BLA.

21     41.    Dynavax has been undergoing clinical trials to test the safety and efficacy of

22  HEPLISAV since at least February 2001. While continuing to conduct its Phase I clinical trials for

23  HEPLISAV, the Company initiated simultaneous Phase II clinical trials in September 2002. By June

24  2005, Dynavax was also pursuing Phase III clinical trials for HEPLISAV.

25     42.    Approximately three years into the first Phase III clinical trial, in March 2008, the

26  FDA placed a clinical hold on HEPLISAV because of a serious adverse event that occurred in one

27  subject who received HEPLISAV in a study being conducted outside the United States. Dynavax

28

1 met with the FDA and in September 2009, the FDA removed the clinical hold and the Company

2 initiated a revised Phase III trial for HEPLISAV.

3     43.    This revised Phase III clinical trial had material design flaws and lacked sufficient

4 robustness to determine whether HEPLISAV merits FDA approval. First, the Phase III clinical

5 trial's safety database size was inadequate, especially in light of the novel adjuvant that the

6 HEPLISAV vaccine contains. In particular, 4,425 subjects had been exposed to the HEPLISAV

7 vaccine during the Company's repeated Phase III clinical trial. In comparison, the median safety

8 database size for the twelve most recent FDA vaccine approvals is more than *twice* as large, 9,500

9 subjects. Also, the trial demographics for the Phase III clinical trial were not representative of the

10 population in the United States and lacked sufficient representation of Asian-Americans, African-

11 Americans, and Latin-Americans. In addition, the Phase III clinical trial lacked a one-year safety

12 follow-up typically required for vaccines. Moreover, the Phase III clinical trial lacked information

13 concerning concurrent use with other vaccines. Finally, Dynavax failed to provide the FDA with

14 sufficient data concerning its manufacturing processes and controls for HEPLISAV. Despite these

15 design flaws, on information and belief, defendants Dina, Oronsky, Carson, Gilbert, Phillips, and

16 Plotkin approved the revised Phase III clinical trial plan. Further, all the Individual Defendants

17 allowed the Company to prolong the poorly designed Phase III clinical trial after being on notice of

18 its inadequacies.

19                     **IMPROPER STATEMENTS**

20     44.    Despite the Phase III clinical trial deficiencies noted above, defendants Dina, Martin,

21 Gilbert, Oronsky, Phillips, Carson, Plotkin, Cano, and Kisner caused or allowed Dynavax to

22 improperly tout HEPLISAV's prospects of gaining FDA approval. The first improper statement was

23 disseminated on April 26, 2012. On that date, Dynavax issued a press release announcing a BLA

24 submission to the FDA for HEPLISAV. The press release stated that "[t]his submission is a very

25 important milestone for Dynavax" and brought the Company closer to achieving FDA approval of

26 HEPLISAV. The statements in the press release were improper because the Phase III clinical trial

27 serving as the basis for the BLA was not properly designed to gather adequate safety and efficacy

28 data. Therefore, the FDA would not approve HEPLISAV. The press release stated:

1  BERKELEY, CA -- (Marketwire) -- 04/26/12 -- Dynavax Technologies Corporation
2  (NASDAQ: DVAX) today announced that it has submitted a U.S. Biologics License
   Application (BLA) to the Food and Drug Administration (FDA) for HEPLISAV,
3  pursuing an indication for immunization against infection caused by all known
   subtypes of hepatitis B virus in adults 18 through 70 years of age.

4  Dynavax President and Chief Medical Officer, Tyler Martin, M.D., said:

5  *This submission is a very important milestone for Dynavax. The final document
6  consists of 305 volumes, and the expansion of the indicated age group following
   the pre-BLA meeting required complete rewrites of the clinical summaries. The
7  entire HEPLISAV team did outstanding work to complete the revisions and submit
8  the BLA ahead of schedule.*

9  *We have requested priority review for HEPLISAV, as we believe it is a significant
   improvement compared to marketed products.* We look forward to working with the
10  FDA on the BLA and to ultimately bringing the benefits of HEPLISAV to the public.

11  The Company anticipates submitting a European Marketing Authorization
   Application (MAA) for HEPLISAV in the third quarter of 2012. Upon approval of
12  the initial HEPLISAV BLA, Dynavax plans to submit a supplemental BLA with an
13  indication and 3-dose primary vaccination regimen for patients with chronic kidney
   disease.

14

15      45.     On May 8, 2012, Dynavax issued another press release touting HEPLISAV's

16  prospects of gaining FDA approval. In particular, Dynavax announced that the Company is

17  transitioning to commercializing HEPLISAV. As part of this transition, that Company would be

18  replacing defendant Dina with a new CEO who has experience with "commercial leadership." The

19  statements in the press release were improper as the repeated Phase III clinical trial underlying the

20  BLA was insufficient to meet the FDA's standards for approval. The press release stated:

21
22  BERKELEY, CA -- (Marketwire) -- 05/08/12 -- Dynavax Technologies Corporation
   (NASDAQ: DV AX) announced today, that *following the recent submission of the
   U.S. Biologics License Applicatio"n (BLA) to the Food and Drug Administration
23  (FDA) it intends to begin developing a commercial operation capable of
24  independently launching HEPLISAVTM in the U.S. The Company believes that
   being able to bring HEPLISAV to the market successful will ultimately help
25  maximize long-term value for its shareholders.*

26  With the goal of laying the foundation for long-term success, Dynavax plans to
   strengthen its senior team with the addition of experienced commercial leadership.
27  Subsequent to a recommendation from Dino Dina, the Company's Chief Executive
   Officer, the Company's Board of Directors has agreed to initiate a process that they
28  anticipate will include his succession. Dr. Dina plans to continue in his role as CEO

1   through this process and will support the transition to his eventual successor. He will
2   also continue as a member of the Company's Board thereafter.

3   46.    On May 9, 2012, Dynavax issued a press release announcing the pricing of an
4   underwritten public offering of 17.5 million shares of its common stock. The press release stated
5   that the Company was undergoing this public offering, at least in part, "to commercialize
6   HEPLISAV in the United States." This press release was improper because Dynavax could not
7   demonstrate the requisite safety and efficacy for HEPLISAV due to its inadequately designed
8   repeated Phase III clinical trial. The press release stated:

9
10  BERKELEY, CA (Marketwire) -- 05/09/12 -- Dynavax Technologies Corporation
    (NASDAQ: DVAX) today announced the pricing of an underwritten public offering
11  of 17,500,000 shares of its common stock, offered at a price to the public of $4.25
    per share. The gross proceeds to Dynavax from this offering are expected to be
12  approximately $74.4 million, before deducting underwriting discounts and
    commissions and other offering expenses payable by Dynavax. Dynavax has granted
13  the underwriters a 30-day option to purchase up to an aggregate of 2,625,000
    additional shares of common stock to cover over-allotments, if any. All of the shares
14  in the offering are to be sold by Dynavax. *The offering is expected to close on or
    about May 14, 2012, subject to customary closing conditions. Dynavax expects to
15  use the net proceeds from the offering primarily to fund activities in preparation
    for the anticipated commercial launch of HEPLISAV™, subject to receipt of
16  regulatory approval, including the manufacture of commercial supply, to fund the
    marketing, sales and medical affairs infrastructure and personnel, including the
17  hiring of a field sales force, and to commercialize HEPLISAV in the United States,*
    if approved by the U.S. Food and Drug Administration, as well as for other general
18  corporate purposes.
19

20  47.    On June 26, 2012, Dynavax issued a press release announcing the FDA's acceptance
21  of reviewing the Company's HEPLISAV BLA. The press release stated that Dynavax "look[s]
22  forward to working with the FDA in moving HEPLISAV through the regulatory review process over
23  the next few months." The press release improperly touted HEPLISAV's purported prospects of
24  achieving FDA approval despite the fact that the repeated Phase III clinical trial was inadequately
25  designed and thus did not merit FDA approval. The press release stated:

26  BERKELEY, CA -- (Marketwire) -- 06/26/12 -- *Dynavax Technologies Corporation
    (NASDAQ: DVAX) today announced that the Food and Drug Administration
27  (FDA) has accepted for review the U.S. Biologics License Application (BLA) for
    HEPLISAV*, pursuing an indication for immunization against infection caused by all
28  known subtypes of hepatitis B virus in adults 18 through 70 years of age.

- 15 -

Dynavax President and Chief Medical Officer, Tyler Martin, M.D., said, "The FDA has established February 24, 2013, as the PDUFA action date. *We look forward to working with the FDA in moving HEPLISAV through the regulatory review process over the next few months*."

The Company anticipates submitting a European Marketing Authorization Application (MAA) for HEPLISAV 'in the third quarter of 2012. *Upon approval of the HEPLISAV BLA, Dynavax plans to submit a supplemental BLA for an indication in patients with chronic kidney disease*.

48. On August 28, 2012, Dynavax issued a press release announcing that the FDA's VRBPAC is scheduled to discuss HEPLISAV at its meeting on November 14-15, 2012. The press release stated that the "VRBPAC meeting is the next step toward bringing HEPLISAV to physicians and patients." This press release was improper because it improperly maintained a confident and optimistic outlook concerning the commercialization of HEPLISAV despite the fact that Dynavax could not demonstrate the requisite safety and efficacy for the FDA to approve HEPLISAV. The press release stated:

BERKELEY, CA -- ·(Marketwire) -- 08/28/12 -- *Dynavax Technologies Corporation (NASDAQ: DVAX) today announced that the U.S. Food and Drug Administration (FDA) has informed the Company that its Vaccines and Related Biological Products Advisory Committee (VRBPAC) is scheduled to discuss HEPLISAV at its meeting on November 14-15, 2012*. Dynavax's Biologic License Application (BLA) for HEPLISA V, pursuing an indication for immunization against infection caused by all known subtypes of hepatitis B virus in adults 18 through 70 years of age, is currently under review by the FDA. The Prescription Drug User Fee Act (PDUFA) date for the FDA to complete its review is February 24, 2013.

*"The VRBPAC meeting is the next step toward bringing HEPLISAV to physicians and patients," said Dynavax President and Chief Medical Officer, Tyler Martin, M.D.* "Our team looks forward to discussing HEPLISAV with the advisory committee and will continue to work closely with the FDA through the review process."

49. On November 1, 2012, Dynavax issued a press release reporting HEPLISAV's numerous purported developments in support of gaining FDA approval. The press release was improper because it misled the market regarding HEPLISAV's prospects of gaining FDA approval given the insufficient data being collected in its Phase III clinical trial. None of the reported

1  developments mattered because the underlying Phase III clinical trial for HEPLISAV was

2  inadequately designed. The press release stated:

3  **Recent Developments**

4  Dynavax reported the following recent developments:

5  • *In June 2012, we reported that the FDA has established February 24,*
6  *2013, as the Prescription Drug User Fee Act (PDUFA) action date for*
   *our HEPLISAV Biologics License Application, pursuing an indication*
7  *for immunization against infection caused by all known subtypes of*
   *hepatitis B virus in adults 18 through 70 years of age. In August 2012,*
8  *the FDA informed the Company that its Vaccines and Related*
   *Biological Advisory Committee is scheduled to discuss HEPLISAV at*
9  *its meeting on November 15, 2012.*

10 • *In July 2012, the American Medical Association Current Procedural*
11 *Terminology (CPT) Panel established a CPT code for an adult two dose*
   *hepatitis B vaccination schedule.* CPT codes are designed to
12 communicate uniform information about medical services and procedures
   among physicians and payers for administrative and financial purposes. If
13 approved, HEPLISA V will be reported using the new two dose code,
   differentiating it from a three dose hepatitis B vaccine schedule.
14

15 • *In July 2012, we filed a Marketing Authorization Application (MAA)*
16 *with the European Medicines Agency (EMA) for HEPLISAV for use in*
   *adults 18 through 70 years of age and in patients with chronic kidney*
17 *disease. The Company was subsequently notified in August 2012 by the*
   *EMA that its MAA was accepted for review.* The EMA is a European
18 Union agency responsible for the evaluation of medicinal products that
   allows companies to submit a single application for marketing
19 authorization in all European Union and European Economic Area
   European Free Trade Association states.

20

21                    **REASONS THE STATEMENTS WERE IMPROPER**

22      50.    The statements referenced above were each improper when made because they failed

23 to disclose and misrepresented the following material, adverse facts, which the Individual

24 Defendants knew, consciously disregarded, or were reckless in not knowing that:

25      (a)    Dynavax's Phase III clinical trial for HEPLISAV had insufficient safety data

26 because it did not enroll enough people for an FDA vaccine approval;

27      (b)    Dynavax's Phase III clinical trial for HEPLISAV was not properly designed as

28 the trial demographics were not representative of the population of the United States;

1   (c) Dynavax's Phase III clinical trial for HEPLISAV lacked a one-year safety

2 follow-up typically required for vaccines;

3   (d) Dynavax's Phase III clinical trial for HEPLISAV lacked information

4 concerning concurrent use with other vaccines;

5   (e) Dynavax failed to provide the FDA with sufficient data concerning its

6 manufacturing processes and controls for HEPLISAV; and

7   (f) as a result of the foregoing, Dynavax would not be able to demonstrate the

8 requisite safety and efficacy for HEPLISAV to receive FDA approval.

9        **THE TRUTH IS SLOWLY REVEALED**

10  51. On November 15, 2012, Dynavax issued a press release announcing that the

11 Company attended a meeting with the FDA's VRBPAC concerning HEPLISAV. The press release

12 disclosed that while the VRBPAC voted thirteen to one that the Company's Phase III clinical trial

13 data supported the efficacy of HEPLISAV, the committee voted eight to five with one abstention

14 that there was insufficient data to adequately support the safety of HEPLISAV. The VRBPAC was

15 particularly concerned about the robustness of the safety data in order to rule out potential rare

16 events, given that HEPLISAV contains a novel adjuvant that has not been broadly studied before.

17 The press release stated:

18  BERKELEY, CA -- (Marketwire) -- 11/15/12 -- Dynavax Technologies Corporation
19  (NASDAQ: DVAX) today announced that the U.S. Food and Drug Administration
  (FDA.) Vaccines and Related Biological Products Advisory Committee (Committee)
20  voted 13 to one that HEPLISAV data adequately demonstrated immunogenicity.
  Additionally, *the Committee voted eight to five with one abstention that there was*
21  *insufficient data to adequately support the safety of HEPLISAV*.

22  Now that Dynavax has received the Committee's input and vote, the Company will
23  continue working with the FDA as it completes its review of the HEPLISAV
  application. The scheduled Prescription Drug User Fee Act (PDUFA) date for.
24  HEPLISAV is February 24, 2013.

25  52. On February 25, 2013, Dynavax issued a press release announcing that it had received

26 a CRL from the FDA regarding its BLA for HEPLISAV. In the CRL, the FDA specified that the

27 indication in adults aged eighteen to seventy years old cannot be approved without further evaluation

28 of safety. The FDA also expressed concern that novel adjuvants may cause rare autoimmune events.

1   The FDA requested additional data from Dynavax's process validation program as well as clarifying

2   information concerning its manufacturing processes and controls. The press release stated:

3

4   BERKELEY, CA -- (Marketwire) -- 02/25/13 -- *Dynavax Technologies Corporation (NASDAQ: DVAX) announced today that it received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA or Agency) regarding its Biologic License Application (BLA) for HEPLISAV,* an investigational adult hepatitis B vaccine.

5

6

7   *In the CRL, the FDA specified that the indication in adults 18-70 years of age cannot be approved without further evaluation of safety in this broad age group. The FDA also continues to express concern that novel adjuvants may cause rare autoimmune events.* However, the Agency indicated its willingness to continue discussions regarding a more restricted use of HEPLISAV. Dynavax plans to discuss the CRL with the FDA to identify the most expeditious path to approval for HEPLISAV, particularly in adults who may receive the greatest benefit from HEPLISAV.

8

9

10

11

12   *Furthermore, the FDA requested additional data from Dynavax's process validation program and clarifying information on the manufacturing controls and facilities related to the assurance of the quality of the commercial product.* Dynavax believes it can provide the information but the exact timeframe for its response cannot be determined until it has met with the Agency.

13

14

15   Dynavax plans to meet with the FDA to discuss the steps necessary for potential approval of HEPLISAV and currently believes the meeting can take place within 6 weeks. Following its meeting with the FDA, Dynavax will provide updates as appropriate.

16

17

18   Dynavax's BLA was accepted for review by the FDA in June 2012. *On November 15, 2012, the FDA's Vaccines and Related Biological Products Advisory Committee (Committee) voted 8 to 5 with 1 abstention that there was insufficient data to adequately support the safety of HEPLISAV,* although the Committee voted 13 to 1 that HEPLISAV data adequately demonstrated immunogenicity. Dynavax's Marketing Authorization Application continues to be under review in Europe.

19

20

21

22   53.     Shortly after issuing the press release, on February 25, 2013, Dynavax held a

23   conference call with investors, analysts, and the media to discuss the Company's response letter from

24   the FDA regarding the BLA for HEPLISAV. During this conference call, defendant Dina stated that

25   the FDA indicated a willingness to consider approving HEPLISAV "for a more focused label." Left

26   unsaid, however, was that the FDA would require Dynavax to conduct additional safety trials before

27   the FDA would even consider approving HEPLISAV. Defendant Dina stated the following:

28

- 19 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    [Dina:] However, *we believe the door remains open for a more focused label for*
2    *HEPLISAV with the safety data that we currently have*.

3    Specifically, FDA has expressed their willingness and interest in continuing the
     discussion about what information is needed to support a more focused use of
4    HEPLISAV stating that the safety data required to support licensure will depend on
     the indication of HEPLISAV and a favorable risk/benefit determination associated
5    with that specific indication.

6                                    *  *  *

7    [Analyst:] And then on the CMC issue again *my question is how long will it take to*
8    *format a package or prepare a package to satisfy the requirement on the additional*
     *information*?

9    [Dina:] I've already answered that question, but let me answer it again. It depends
10   entirely on clarifying with FDA exactly to what level of excruciating detail or
     formalities some of those things need to be brought and in particular how expensive
11   the data that we need to -- request and resubmit must be. We believe that we have the
     bulk of those data. If we have not interpreted it correctly their requirement—there
12   will be some additional ones that might take some additional time. It isn't going to be
     an instantaneous turnaround; we are going to have to do some work to assemble all
13   of this and make sure that it fits their requirements but *let's say that we are talking*
14   *about months and not years*.

15        54.   On June 10, 2013, Dynavax issued a press release announcing that it recently

16   concluded a meeting with the FDA regarding its BLA for HEPLISAV. During the meeting, the

17   FDA identified that: (i) the safety database for HEPLISAV needed additional subjects; and (ii)

18   analyzing the risks and benefits of HEPLISAV's use in discrete patient populations did not

19   fundamentally address the shortfall in the safety database. The press release stated:

20
     BERKELEY, CA -- (Marketwired) -- 06/10/13 -- Dynavax Technologies
21   Corporation (NASDAQ: DV AX) today reported that it recently concluded a meeting
     with the U.S. Food and Drug Administration (FDA or Agency) regarding its Biologic
22   License Application (BLA) for HEPLISAV, and investigational adult hepatitis B
     vaccine. The meeting followed recommendations expressed in November 2012 by
23   the Vaccines and Related Biological Products Advisory Committee (VRBPAC)
24   regarding the size of Dynavax's safety database. *The meeting with FDA resulted in*
     *the following messages:*
25
     •   *The safety database does indeed need additional subjects;*
26
                                    *  *  *
27
     •   *Analyzing the benefit/risk of HEPLISAV's use in discrete patient populations did*
28       *not fundamentally address the shortfall in the safety database. It was concluded*

                                    - 20 -
                     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*that to do so would unnecessarily restrict the patient population that could benefit from HEPLISAV's approval;*

- *The additional safety data collected would facilitate review for an indication in adults 18-70 years of age.*

55. On a conference call following the June 10, 2013 press release, Dynavax's new CEO, non-defendant Eddie Gray ("Gray"), stated that the result of the FDA's findings were not surprising to the Company because the VRBPAC discussed the same deficiencies regarding the size of Dynavax's safety database in November 2012. Non-defendant Gray stated, in relevant part:

[Gray:] *In my view the outcome of the meeting was clear and followed, I think predictably, the themes expressed by VRBPAC last November.* As we disclosed in the press release issued today, the main conclusions can be summarized as follows:

Firstly there was a strong endorsement for HEPLISAV's immunogenicity data demonstrated in previous clinical trials. In that context the spirit and the tone of the interactions with the FDA suggest to us their support for HEPLISAV's path forward to approval.

*Secondly, there was an acknowledgment that our safety database needs additional patients to support approval for any indication. Because HEPLISAV contains a novel adjuvant, we will need to increase the number of patients evaluable for safety.*

*Although we did discuss with FDA HEPLISAV's use in discrete patient populations, focusing on the improved benefit/risk profile of the product in these groups, this approach did not address the fundamental issue of a shortfall in the safety database. Furthermore, our discussions suggests this would unnecessarily restrict the patient population that could benefit from HEPLISAV's approval.*

## DAMAGES TO DYNAVAX

56. As a result of the Individual Defendants' improprieties, Dynavax disseminated improper, public statements concerning the Company's business prospects, specifically relating to the purported Phase III clinical trial of HEPLISAV. These improper statements have severely damaged Dynavax's credibility, corporate image, and goodwill as reflected by the Company's over $568 million, or nearly 69% market capitalization loss.

57. Further, as a direct and proximate result of the Individual Defendants' actions, Dynavax has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    (a)    costs incurred in investigating and defending Dynavax and certain officers and
2 directors in the Securities Class Actions;

3    (b)    costs incurred from paying any potential settlement or adverse judgment in the
4 Securities Class Actions;

5    (c)    costs incurred from implementing poorly designed clinical trials and
6 prolonging useless clinical trials; and

7    (d)    costs incurred from compensation and benefits paid to the defendants who
8 have breached their duties to Dynavax, including, but not limited to, the severance packages awarded
9 to defendants Dina and Martin as alleged herein.

10    **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

11    58.    Plaintiff brings this action derivatively in the right and for the benefit of Dynavax to
12 redress injuries suffered, and to be suffered, by Dynavax as a direct result of breaches of fiduciary
13 duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by
14 the Individual Defendants. Dynavax is named as a nominal defendant solely in a derivative capacity.
15 This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

16    59.    Plaintiff will adequately and fairly represent the interests of Dynavax in enforcing and
17 prosecuting its rights.

18    60.    Plaintiff was a shareholder of Dynavax at the time of the wrongdoing complained of,
19 has continuously been a shareholder since that time, and is a current Dynavax shareholder.

20    61.    The current Board of Dynavax consists of the following eleven individuals:
21 defendants Oronsky, Cano, Carson, Dina, Gilbert, Kisner, Martin, Phillips, and Plotkin, and non-
22 defendants Gray and Natale Ricciardi. Plaintiff has not made any demand on the present Board to
23 institute this action because such a demand would be a futile, wasteful, and useless act, as set forth
24 below.

25    **Demand Is Excused Because a Majority of the Current Board Faces a Substantial Likelihood of Liability for Their Misconduct**
26

27    62.    As explained above, defendants Dina and Martin breached their fiduciary duties by
28 making improper statements regarding the Company's business prospects, especially those related to

- 22 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  the likelihood of the FDA approval of HEPLISAV. Accordingly, demand is excused as to
2  defendants Dina and Martin.

3      63.    Defendants Gilbert, Oronsky, and Phillips face a substantial likelihood of liability for
4  their misconduct as members of Dynavax's Audit Committee. As explained above, the Audit
5  Committee regularly met with management to discuss the Company's quarterly financial press
6  releases. In addition, defendants Gilbert, Oronsky, and Phillips discussed with management
7  significant financial reporting matters at Audit Committee meetings. On information and belief,
8  during these meetings these defendants discussed the Company's core operations, including the
9  nature and extent of the testing process for HEPLISAV and all communications with the FDA
10 regarding HEPLISAV's clinical trials. As a result, the Audit Committee Defendants knew or
11 recklessly disregarded that the positive statements regarding HEPLISAV's prospects of gaining FDA
12 approval were misleading when approving or allowing the Company to publish the statements at
13 issue here. Accordingly, defendants Gilbert, Oronsky, and Phillips face a substantial likelihood of
14 liability for their breach of fiduciary duties, rendering any demand upon them futile.

15     64.    Defendants Oronsky, Cano, Carson, Dina, Gilbert, Kisner, Martin, Phillips, and
16 Plotkin, nine of the eleven members of the Board, breached their duty of loyalty by causing and
17 allowing the Company to make improper statements despite the blatant deficiencies in HEPLISAV's
18 Phase III clinical trial putting them on notice of the FDA's impending rejection of the drug. *First*,
19 the population size of the Phase III clinical trial was blatantly inadequate due to the enrollment of
20 only 4,425 subjects. In comparison, the median safety database size for the twelve most recent FDA
21 vaccine approvals going back to February 2000 is more than twice as large at 9,500 subjects.
22 *Second*, the trial demographics for the Phase III clinical trial were not representative of the
23 population in the United States and lacked sufficient representation of Asian-Americans, African-
24 Americans, and Latin-Americans. *Third*, the Phase III clinical trial lacked a one-year safety follow-
25 up typically required for vaccines. *Fourth*, the Phase III clinical trial lacked information concerning
26 concurrent use with other vaccines. *Finally*, Dynavax failed to provide the FDA with sufficient data
27 concerning its manufacturing processes and controls for HEPLISAV on its BLA.

28

1         65.     Defendants Oronsky, Cano, Carson, Dina, Gilbert, Kisner, Martin, Phillips, and

2 Plotkin knew of these issues because six of them, defendants Oronsky, Carson, Dina, Gilbert,

3 Phillips, and Plotkin, would have needed to approve the Company's revised Phase III clinical trial

4 plan in 2009. Further, as stated above, all the Individual Defendants regularly reviewed the risk that

5 the FDA would not approve HEPLISAV with management. Such a discussion would necessarily

6 include a thorough review of the Company's Phase III clinical trial design, including its serious and

7 significant design flaws. Accordingly, defendants Oronsky, Cano, Carson, Dina, Gilbert, Kisner,

8 Martin, Phillips, and Plotkin face a substantial likelihood of liability for their breach of fiduciary

9 duties, excusing any demand upon them.

10         66.     Moreover, defendants Oronsky, Cano, Carson, Dina, Gilbert, Kisner, Martin, Phillips,

11 and Plotkin were also aware of the deficiencies in the Company's revised Phase III clinical trial

12 because eight of them, defendants Plotkin, Cano, Oronsky, Martin, Dina, Phillips, Kisner, and

13 Carson had extensive previous experience conducting research regarding vaccines, undergoing

14 clinical trials, and working with the FDA to approve new drug products prior to their directorship

15 roles at Dynavax. These previous experiences include, but are not limited to:

16         (a)     defendant Plotkin researching vaccines and working in the vaccine developing

17 industry since at least 1960 as a Professor of Virology at the Wistar Institute, Professor of Pediatric

18 and Microbiology at the University of Pennsylvania, Director of Infectious Diseases and Senior

19 Physician at the Children's Hospital of Philadelphia, and Medical and Scientific Director and

20 Executive Advisor at Sanofi Pasteur. Since the beginning of his career, defendant Plotkin worked on

21 the development of numerous vaccines, including vaccines to treat anthrax, rubella, polio, rabies,

22 and rotavirus. Moreover, defendant Plotkin contributed to the publication of two textbooks, *History*

23 *of Vaccine Development* and *Vaccines.*

24         (b)     defendant Cano working in the vaccine developing industry since at least 1972

25 with Lederle Laboratories ("Lederle"), Aviron, Vaxin Inc., and Cano Biotech Corp. Since the

26 beginning of his career, defendant Cano has worked on the development of various vaccines,

27 including vaccines to treat HIV infections, influenza, tuberculosis, pneumonia and non-Hodgkin's

28 lymphoma.

1             (c)     defendant Oronsky working in the vaccine developing industry since at least

2     1973 with Lederle, Ciba-Geigy Pharmaceutical Company, Coulter Pharmaceuticals, Tesaro, Inc.,

3     Signal Pharmaceuticals, Inc., Myogen, Inc., and Anesiva, Inc.  Since the beginning of his career,

4     defendant Oronsky has worked on the development of vaccines treating tumors, chronic lymphocytic

5     leukemia, chemotherapy-induced nausea and vomiting, and ovarian cancer.

6             (d)     defendant Martin working in the vaccine developing industry since at least

7     1982 with Chiron Vaccines ("Chiron") (formerly known as Biocine Company) and Chiron

8     Corporation. Defendant Martin has worked on the development of numerous vaccines to treat HIV

9     infections, influenza, kidney cancer, leukemia, non-Hodgkin's lymphoma, and malignant melanoma.

10            (e)     defendant Dina working in the vaccine developing industry since at least 1982

11    with Chiron. Defendant Dina has worked on the development of various vaccines including those

12    treating HIV infections, influenza, kidney cancer, leukemia, non-Hodgkin's lymphoma, and

13    malignant melanoma.

14            (f)     defendant Phillips working in the vaccine developing industry since at least

15    1986 with Immunex, Miles Laboratories, and Portola Pharmaceuticals.  Defendant Phillips has

16    worked on the development of many vaccines, including vaccines to treat juvenile rheumatoid

17    arthritis, HIV infections, and thromboembolism.

18            (g)     defendant Kisner working in the vaccine developing industry since at least

19    1988 with Tekmira Pharmaceuticals Corp., Isis Pharmaceuticals, Inc., Abbott Laboratories,

20    SmithKline Beckman Pharmaceuticals, Sequoia Pharmaceuticals, Inc., and Avera Pharmaceuticals,

21    Inc.  Defendant Kisner worked on the development of various vaccines to treat cancer, HIV

22    infections, social phobia, irritable bowel syndrome, overactive bladder syndrome, and obesity.

23            (h)     defendant Carson working in the vaccine developing industry since at least

24    2000 with Salmedix, Inc., Epiphany Biosciences, Inc., Telormedix SA, Syndax Pharmaceuticals,

25    Triangle Pharmaceuticals, and IDEC Pharmaceuticals.   Defendant Carson worked on the

26    development of numerous vaccines, including those treating infectious mononucleosis, carcinoma,

27    herpes, Hodgkin's lymphoma, breast cancer, lung cancer, HIV infections, and Hepatitis B.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

67. Non-defendant Gray is not independent of the Individual Defendants. Gray's principal professional occupation is his employment with Dynavax, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In particular, the Individual Defendants appointed non-defendant Gray as the Company's new CEO in April 2013 after defendant Dina resigned. In addition to receiving a base salary of $500,000, non-defendant Gray received a relocation fee of $200,000. Moreover, non-defendant Gray is eligible to receive another $300,000 as an annual bonus. Defendant Gray will not initiate litigation against the Individual Defendants, who, as a majority of the Board, control his continued employment and future remuneration. Accordingly, demand is excused as to non-defendant Gray.

68. The acts complained of constitute violations of the fiduciary duties owed by Dynavax's officers and directors and these acts are incapable of ratification.

69. Plaintiff has not made any demand on the other shareholders of Dynavax to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) Dynavax is a publicly held company with over 182 million shares outstanding and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

70. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

71. The Individual Defendants owed and owe Dynavax fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Dynavax the highest obligation of good faith, fair dealing, loyalty, and due care.

72. Each of the Individual Defendants violated and breached their fiduciary duties. More specifically, the Individual Defendants violated their duty of loyalty by creating a culture of

1  lawlessness within Dynavax, and/or consciously failing to prevent the Company from engaging in
2  the unlawful acts complained of herein.

3      73.    Defendants Dina and Martin, as Officer Defendants, knowingly, recklessly, or with
4  gross negligence: (i) made, or caused or allowed the Company to make, improper statements
5  concerning HEPLISAV's prospects of gaining FDA approval; and (ii) ignored red flags alerting them
6  of the deficiencies in HEPLISAV's Phase III clinical trial and the results gathered therein.

7      74.    The Director Defendants, Dina, Martin, Gilbert, Oronsky, Phillips, Carson, Plotkin,
8  Cano, and Kisner, as directors of the Company, owed Dynavax the highest duty of loyalty. The
9  Director Defendants knowingly or recklessly breached their duty of loyalty by: (i) causing or
10 allowing the Company to make improper statements about HEPLISAV's prospects of gaining FDA
11 approval; and (ii) disregarding red flags alerting them of the inadequacies of HEPLISAV's Phase III
12 clinical trial and the results gathered therein.

13     75.    The Audit Committee Defendants, Gilbert, Oronsky, and Phillips, breached their
14 fiduciary duty of loyalty by approving the statements described herein that were made during their
15 tenure on the Audit Committee, which they knew or were reckless in not knowing were improper.

16     76.    As a direct and proximate result of the Individual Defendants' breaches of their
17 fiduciary duties, Dynavax has sustained substantial damages, including direct monetary damages and
18 damages to its reputation and goodwill in the capital markets. As a result of the misconduct alleged
19 herein, the Individual Defendants are liable to the Company.

20     77.    Plaintiff, on behalf of Dynavax, has no adequate remedy at law.

21                                   **COUNT II**

22          **Against the Individual Defendants for Waste of Corporate Assets**

23     78.    Plaintiff incorporates by reference and realleges each and every allegation contained
24 above, as though fully set forth herein.

25     79.    As a result of the misconduct described above, the Individual Defendants have wasted
26 corporate assets by forcing the Company to expend valuable resources in defending itself in the
27 Securities Class Actions that they brought on with their improper statements. In addition, the
28 Individual Defendants have caused Dynavax to waste its assets by conducing the inadequately-

1 designed Phase III clinical trial for HEPLISAV. Finally, the Individual Defendants also caused the

2 Company to waste its corporate assets by paying improper compensation to certain of its executive

3 officers and directors that breached their fiduciary duties.

4    80.    As a result of the waste of corporate assets, the Individual Defendants are liable to the

5 Company.

6    81.    Plaintiff, on behalf of Dynavax, has no adequate remedy at law.

7                                    **COUNT III**

8              **Against the Individual Defendants for Unjust Enrichment**

9    82.    Plaintiff incorporates by reference and realleges each and every allegation contained

10 above, as though fully set forth herein.

11   83.    By their wrongful acts and omissions, the Individual Defendants were unjustly

12 enriched at the expense of and to the detriment of Dynavax. The Individual Defendants were

13 unjustly enriched as a result of the compensation and director remuneration they received while

14 breaching fiduciary duties owed to Dynavax.

15   84.    Plaintiff, as a shareholder and representative of Dynavax, seeks restitution from these

16 defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and

17 other compensation obtained by these defendants, and each of them, from their wrongful conduct

18 and fiduciary breaches.

19   85.    Plaintiff, on behalf of Dynavax, has no adequate remedy at law.

20                                **PRAYER FOR RELIEF**

21   WHEREFORE, plaintiff, on behalf of Dynavax, demands judgment as follows:

22   A.    Against all of the defendants and in favor of the Company for the amount of damages

23 sustained by the Company as a result of the defendants' breaches of fiduciary duty, waste of

24 corporate assets, and unjust enrichment;

25   B.    Directing Dynavax to take all necessary actions to reform and improve its corporate

26 governance and internal procedures to comply with applicable laws and to protect Dynavax and its

27 shareholders from a repeat of the damaging events described herein, including, but not limited to,

28 putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or

1 | Articles of Incorporation and taking such other action as may be necessary to place before
2 | shareholders for a vote of the following Corporate Governance Policies:

3 |         1.     a proposal to redesign the Company's clinical trials to meet FDA standards
4 | and avoid wasting corporate assets on inadequate studies;

5 |         2.     a proposal to create a committee of independent Dynavax directors that are
6 | tasked with monitoring HEPLISAV's clinical trials and the FDA approval process;

7 |         3.     a proposal to strengthen the Company's disclosure controls;

8 |         4.     a proposal to strengthen the Board's supervision of operations and develop
9 | and implement procedures for greater shareholder input into the policies and guidelines of the
10 | Board; and

11 |         5.     a provision to permit the shareholders of Dynavax to nominate at least three
12 | candidates for election to the Board;

13 |     C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state
14 | statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust
15 | on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to
16 | assure that plaintiff on behalf of Dynavax has an effective remedy;

17 |     D.     Awarding to Dynavax restitution from defendants, and each of them, and ordering
18 | disgorgement of all profits, benefits, and other compensation obtained by defendants;

19 |     E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable
20 | attorneys' fees, accountants' and experts' fees, costs, and expenses; and

21 |     F.     Granting such other and further relief as the Court deems just and proper.

22 | **JURY DEMAND**

23 |     Plaintiff demands a trial by jury.

24 | DATED: August 9, 2013             ROBBINS ARROYO LLP
                                BRIAN J. ROBBINS
25 |                                 CRAIG W. SMITH
                                JENNY L. DIXON
26 |                                 GINA STASSI

27 |

28 |                                 BRIAN J. ROBBINS

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
jdixon@robbinsarroyo.com
gstassi@robbinsarroyo.com

RYAN & MANISKAS, LLP
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: (484) 588-5516
Facsimile: (484) 450-2582
rmaniskas@rmclasslaw.com

Attorneys for Plaintiff

881281

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Warren Drabek, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: 7/10/13

Warren Drabek